

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP–76,244

### EX PARTE BENJAMINE JOHN SPENCER, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. W87-96524-T(A) FROM THE
### 283RD JUDICIAL DISTRICT COURT OF DALLAS COUNTY

MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, HERVEY, and COCHRAN, JJ., joined. PRICE, J., filed a concurring opinion in which HERVEY and COCHRAN, JJ., joined. KEASLER, J., concurred.

### O P I N I O N

Applicant, Benjamine[1] John Spencer, was convicted of murder and sentenced to 35 years' confinement. He filed a motion for new trial, which was granted. On retrial, he was convicted of aggravated robbery and sentenced to life in prison. The conviction was affirmed on appeal. *Spencer v. State*, No. 05-88-00397-CR (Tex. App.–Dallas May 3, 1989) (not designated for publication). Applicant filed an application for writ of habeas

---

[1]Applicant's name has been spelled both "Benjamin" and "Benjamine" in court documents. Because Applicant himself spells it "Benjamine," that is the spelling we will use.

corpus claiming that he is actually innocent, that trial counsel rendered ineffective assistance, and that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Mooney v. Holohan*, 294 U.S. 103 (1935).

The trial court held an evidentiary hearing and recommended that we grant relief. We remanded the case to the trial court for additional findings and conclusions. After receiving the trial court's findings and conclusions, we filed and set this case for submission and ordered the parties to brief whether Applicant properly raised a free-standing actual innocence claim, whether the evidence he relies on is newly discovered or newly available, whether we should consider advances in science and technology when determining whether evidence is newly discovered or newly available, and whether Applicant has shown by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Relief is denied.

## BACKGROUND

At around 10:45 p.m. on March 22, 1987, police received a call that a man was lying face down in the street. When they arrived, they found the victim, Jeffrey Young, unconscious and bleeding. He was taken to the hospital, where he died. It was later determined that he died from severe skull fractures that were a result of multiple blows to the head. Less than two hours after the victim was found in the street, police received a call about a BMW parked in a nearby alley. They quickly ascertained that the car belonged to the victim.

Two days later, a witness, Gladys Oliver, went to the police station to tell what she had seen in the alley that night and also to give the police the names of others who may have seen something. She had heard that the police were accusing another man named Spencer, Van Mitchell Spencer, of stealing the BMW, and she wanted to inform them that it was Applicant, Benjamine John Spencer, whom she had seen getting out of the car. Based on the information from Oliver and the other witnesses, Applicant and his co-defendant, Nathan Robert Mitchell, were arrested the next day.

Several eyewitnesses who lived in the area where the victim and his car were found testified at Applicant's trial. Charles Stewart testified that he saw the victim get pushed out of the car, saw the car pull into the alley, and saw Applicant get out of the passenger's side of the car and Mitchell get out of the driver's side. He saw Applicant jump Gladys Oliver's fence and go through her back yard. He testified about the lighting conditions in the alley, including that there was a streetlight in the alley and a light in the back of one of the houses that backed up to the alley. He also stated that the lights inside the car came on when the doors opened, and he recognized Applicant and Mitchell.

Donald Merritt testified that he saw a white man lying in the street struggling to breathe and with blood on his head. Merritt stayed at the scene until paramedics arrived. He later saw the BMW in the alley and saw Applicant's co-defendant standing by the car. He said he could see clearly because there was a streetlight nearby.

The alley where the BMW was found was behind Gladys Oliver's house. She

testified that she saw the BMW stopped behind her neighbor's house and saw Applicant get out of the passenger's side of the car and Mitchell get out of the driver's side. She said she saw Applicant go through one neighbor's yard and knock on another neighbor's door. Oliver stated that there was a streetlight in the alley and a large light in the back of her neighbor's house that lit her yard. She claimed that when she went to the front of her house, she saw Applicant's car parked in the street, but it was gone about 15 minutes later. She did not tell the police this the day after the offense when they went door-to-door asking questions, but two days later she went to the police station to tell them what she had seen and claimed that she was afraid for her life.

Jimmie Cotton testified that he was in his kitchen cooking dinner when he saw the BMW pull into the alley. He noticed the BMW because it was not the sort of car he usually saw in the neighborhood. He said that when the car doors opened, a light came on, and he saw Applicant get out of the passenger side. Cotton saw Applicant climb the fence around Gladys Oliver's yard and later saw him get into his own car and drive away. Cotton testified that he could see everything in the alley because there was a streetlight just behind his house and his neighbor had a porch light on.

Danny Edwards was one of Applicant's cellmates. Edwards informed police that Applicant told him about the crime. He testified that Applicant said he hit the victim in the head with a gun, put him in the back seat of the car, hit him a couple more times while they were driving, and then kicked him from the car. Edwards said that Applicant

planned to take the car to a chop shop.

Applicant offered testimony at trial that, on the night of the offense, he drove Ramona Williams and her friend to church. He said he spent the rest of the evening with Ramona's sister, Christie, first at her house and then at the park, and that Ramona saw Applicant's car at the park at around 11 p.m. when she was returning home from church.

A jury found Applicant guilty of murder in 1987, and after his motion for a new trial was granted, a separate jury found him guilty of aggravated robbery in 1988. His co-defendant, Mitchell, was also found guilty based on much of the same eyewitness testimony that was raised in both of Applicant's trials.

## APPLICANT'S WRIT OF HABEAS CORPUS

Applicant raises the following issues in his application for writ of habeas corpus:

(1) The State failed to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963);

(2) The State knowingly relied on perjured testimony in violation of *Mooney v. Holohan*, 294 U.S. 103 (1935);

(3) Trial counsel rendered ineffective assistance; and

(4) Applicant is actually innocent.

Applicant states that his trial was "constitutionally deficient." He claims that Edwards' testimony was perjured and that he testified falsely in exchange for a reduced sentence. He also claims that Edwards recanted his testimony in 2002. Applicant asserts

that it was Michael Hubbard who probably committed the murder. Hubbard told friends that he had committed the crime and that two men had already been arrested for it. Applicant claims that Hubbard had knowledge of items that were stolen from the victim that had not been publicly disclosed. Applicant says that the police had information related to Hubbard's involvement in the crime, but they failed to investigate.

At the writ hearing, Applicant presented testimony that Hubbard's friend, Kelvin Johnson, was the cellmate of Applicant's co-defendant, Mitchell. After Mitchell attempted suicide in jail, Johnson told him that he knew who had committed the offense for which Mitchell had been arrested. Police contacted Johnson, and he informed the detective that Hubbard had told him about "this white dude that had been killed in west Dallas." Johnson told the officer that Hubbard admitted to stealing the man's car and putting him in the trunk. Hubbard told Johnson that the man fell out of the trunk and hit his head and that is how he died. The officer drafted an affidavit of Johnson's statement, but Johnson refused to sign it. At the writ hearing, Johnson said that he had been mad at Hubbard at the time the police took the affidavit because Hubbard had turned him in for a series of aggravated robberies that they had committed together, but he said the reasons why he refused to sign the affidavit were his concern for Hubbard's mother and that he did not want Hubbard to get the death penalty.

Ferrell Scott also testified at the writ hearing. Scott claimed that Hubbard told him that he had robbed a man outside of an office building, took his BMW, put him in the

trunk, and drove him to west Dallas. Hubbard told Scott that while he was driving, he noticed that the trunk of the car was open, so he abandoned the car in an alley. Scott helped Hubbard sell a Seiko watch that he claimed was stolen from the victim. After Scott met Applicant in prison, he claimed that he told his attorney and the police that Hubbard had committed the offense for which Applicant had been charged. Applicant complains that his trial counsel was ineffective for failing to argue at trial that Hubbard had committed the crime.

The defense also called Dr. Michel, a forensic visual science expert, to testify at the writ hearing. Dr. Michel's expert testimony was that the eyewitnesses could not have seen the face of the person exiting the BMW because of darkness, distance, and movement. Specifically, Dr. Michel testified that Cotton would not have been able to make a facial identification of a person jumping a fence 113 feet away from him. He also stated that Stewart was so far from the BMW that he would not be able to make a facial identification even in daylight, and Oliver could not have made a facial identification of a person exiting the passenger side of the BMW because her window was 123 feet away from the car. Applicant says that the State's expert agreed that with the distance and lighting conditions, Oliver would not have been able to identify facial features of the individuals exiting the car. Applicant's argument is that it was physically impossible for the eyewitnesses to make a facial identification.

Oliver and Cotton testified at the writ hearing and reiterated their testimony from

Applicant's trials.  Eyewitness Stewart died before the writ hearing.

**FINDINGS AND CONCLUSIONS OF THE TRIAL COURT**

After the habeas hearing, the trial court entered 300 findings of fact and conclusions of law, summarized as follows:

Finding no merit to Applicant's *Brady*, ineffective assistance, and knowing use of false testimony claims, the trial court recommended that relief be denied on these grounds.

The trial court found that the only evidence inculpating Applicant at trial consisted of the testimony by Danny Edwards that Applicant confessed to the crime while he was in jail and the testimony of the eyewitnesses who saw Applicant exit the victim's BMW; there was no physical evidence presented by the State connecting Applicant to the crime. The trial court concluded "that none of Danny Edwards' testimony was credible and, when viewed in the light most favorable to the State, was inadmissible hearsay."

The court determined that Danny Edwards's testimony that he did not speak directly with Applicant was newly discovered evidence, as was the testimony of Kelvin Johnson regarding Hubbard's confession to the abduction and robbery of Jeffrey Young. The court found that Hubbard's confession was more consistent with the facts of the offense than the testimony given by Danny Edwards, and it stated that "between the unsigned Affidavit in Fact provided by Kelvin Johnson and the signed statement by Danny Edwards, on their face, the Johnson statement is more consistent with the actual

facts of the murder and therefore more credible."

Applicant's habeas evidence also includes expert testimony that the now developed field of forensic visual science conclusively establishes that it was physically impossible for the purported eyewitnesses to make the identification that they claimed.

Regarding the expert testimony, the court found that at the time of the trial in 1987, "the evidence generated by the application of forensic visual science was unavailable and undiscoverable." Based on the testimony of the expert, the court found "that Cotton did not actually see the face of the person exiting the BMW," that "Cotton was not able to make an identification of the person he claimed to have seen at that point," and that Cotton was not a credible witness and was not worthy of belief. The court also found "that Stewart was so far from the BMW that even in daylight it would take super human [sic] abilities to make a facial identification" and "that it was not possible for Charles Stewart to see well enough to make facial identifications of any persons exiting the BMW." Similarly, the court found "that it was not possible for Gladys Oliver to see well enough to make facial identifications of any persons exiting the BMW," and Gladys Oliver was not a credible witness and was not worthy of belief. The court determined "that the identification testimony given by Jimmy Cotton, Charles Stewart, and Gladys Oliver was not truthful" and that "it was physically impossible for Jimmy Cotton, Charles Stewart, and Gladys Oliver to make facial identification of a person exiting the BMW on March 22, 1987."

Finally, the court determined that, "[i]n the instant case, after considering the newly discovered evidence consisting of the expert testimony of Dr. Paul Michel that the three eye witnesses could not have seen what they testified to, the only remaining evidence of Applicant's guilt is the testimony of Danny Edwards which was at best inadmissible hearsay. Thus, there remains no evidence of Applicant's guilt." As a result, the court concluded that "Applicant has carried his burden of production and persuasion and the writ should issue." The court recommended that relief be granted on the grounds of actual innocence.

## STATE'S RESPONSE

The State responds that Applicant did not properly raise a free-standing actual innocence claim; that the evidence is not newly discovered; and that advances in technology should be considered, but only when the advances are reliable and are able to test the evidence as it existed at the time of the crime.

The State claims that Applicant has not shown by clear and convincing evidence that no reasonable juror would have convicted him in light of newly discovered evidence. Based on *Schlup*,[2] Applicant claims that constitutional errors "probably resulted in the conviction of a man who is actually innocent." The State says that Applicant does not directly raise an actual innocence claim. The State claims that, even if Applicant did properly raise an actual innocence claim, he is not entitled to relief under *Schlup* or

---

[2]*Schlup v. Delo*, 513 U.S. 298 (1995).

*Herrera*.[3]  It is not a *Schlup* claim because, according to the trial court's findings and conclusions, there was no *Brady* violation, the State did not knowingly use false testimony, and counsel was not ineffective; therefore, Applicant has not proven that there was constitutional error at his trial.  And the State argues that, even if we consider the issues raised by Applicant to be newly discovered evidence, he is not entitled to relief under *Herrera* because the evidence does not show that he is actually innocent.

Second, the State says that Applicant does not present newly discovered evidence. The State claims that the only affidavit from Danny Edwards that was not available and known to Applicant at the time of the trial was his 2002 affidavit, which he later said contained untrue statements.  And the 2002 affidavit is contradicted by his trial testimony and by his 2005 affidavit.  The State argues that this evidence does not show that it is "'probable that the verdict would be different' as required by *Elizondo*, 947 S.W.2d at 209."[4]

The State disagrees with the trial court's conclusion that the testimony of Kelvin Johnson is newly discovered evidence.  The State argues that this evidence was known to defense counsel before Applicant's trial.  Defense counsel had an affidavit in which Johnson stated that Michael Hubbard admitted to committing the offense.  However, counsel also knew that Johnson had recanted this statement and had failed a polygraph

---

[3]*Herrera v. Collins*, 506 U.S. 390 (1993).

[4]*Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996).

given to him to test the validity of his claim regarding Hubbard. The State asserts that Johnson's knowledge of specific facts about the crime likely came from Applicant's co-defendant, who shared a cell with Johnson, and not from Hubbard, who Johnson claimed told him about the offense. Because this is not newly discovered evidence and is not credible, it cannot be considered as evidence supporting Applicant's claim of actual innocence.

The State argues that Applicant has not shown by clear and convincing evidence that Dr. Michel's report is true and would have caused a different result at trial. The lighting conditions and the distance of the witnesses was known at the time of trial, and defense counsel was able to point out that witnesses would have had a difficult time identifying the defendant in the alley. Thus, even if an expert was not available at the time of the trial to testify about possible problems with illumination, the expert's report and testimony should not be considered newly discovered evidence. The fact that the witnesses were at a certain distance and under certain lighting conditions was known at the time of trial and was presented to the jury for their consideration.

The State agrees that advances in science and technology should be considered when determining whether evidence is newly discovered or newly available. However, since not all advances have the same reliability, the weight to be given the advances must be considered on a case-by-case basis. In this case, little weight should be given because the expert's report could not be based on the conditions at the time of the offense, forcing

the expert to make too many assumptions. The State argues that since the evidence is not the same as it existed at the time of the offense, it cannot be treated the same way DNA is. All of these assumptions cannot overcome the testimony of witnesses who said they had enough light to see Applicant get out of the victim's car.

The State filed an objection to the trial court's findings and conclusions, claiming that the court does not address the issue of laches and that the court recommends relief on a ground that was not properly raised in the application or proven by the evidence. The State claims that Kelvin Johnson's evidence was known to defense counsel before Applicant's 1998 trial; thus it is not newly discovered. The State argues that the eyewitnesses were credible and that three separate juries believed their testimony–juries in each of Applicant's two trials and his co-defendant's trial. The State notes that the judge at the habeas hearing was not at the trial and was not able to judge the credibility of the eyewitness testimony at trial. The State asserts that Applicant's expert failed to take into consideration that Gladys Oliver was very familiar with Applicant as she had known him and his family for years and had even seen him earlier on the day of the offense, and that eyewitness Stewart had also known Applicant for several years and was able to recognize him when he saw him get out of the victim's car in the alley.

The State argues that the only new evidence is the report by the expert. The State says,

> Rather than comparing the old inculpatory evidence with the new evidence, the trial court seems to have simply declared that none of the State's

witnesses are credible because Applicant's expert says they could not have seen what they saw. After rejecting all of the State's evidence, the court then determined that only the new evidence is left, so Applicant must be actually innocent. The State submits that when a true comparison of the old and the new evidence is made, a rational trier of fact would give much more credence to the testimony of three eyewitnesses who were at the scene of the crime twenty years ago, and who knew and recognized Applicant, as compared to a lighting expert who reviewed the scene sixteen years later and based his opinions on incorrect and incomplete assumptions.

## REMAND

We remanded the case to the trial court for additional findings and conclusions. Specifically, we asked the trial court to determine what methods were used by the expert and whether these methods were available at the time of Applicant's trial. We also requested further findings regarding Danny Edwards's testimony, including whether he made a plea agreement with the State after meeting Applicant in prison, whether Edwards had filed any pretrial motions on Applicant's behalf, and whether there was evidence to support Edwards's claim that Applicant had sanded his fingerprints. Finally, we asked the trial court to enter findings regarding Applicant's claim of ineffective assistance of counsel and the State's claim of laches.

In response to our remand, Applicant states that Dr. Michel analyzed the "illumination and visibility" to evaluate the validity of the eyewitness accounts and determined that all the witnesses had three constraints: distance, low levels of illumination, and time limitations. The expert concluded that witness Cotton had the additional constraint of "adaptation to daylight levels of illumination while viewing a

dark environment" and reflection from the light in his kitchen. Dr. Michel considered only distance, darkness, and motion–"the ability of us as human beings with our sensory organs for light which are our eyes to discern things." He claimed that he did not consider eyewitness familiarity with the Applicant because that was "the soft science of recognition, memory, cognition and fitting in what makes sense." He said, "I have stayed away from that because my opinion is because there was no basis to believe that the eyeballs could have discerned seeing clearly, that the opinions given by the witnesses were something over in the soft science area of memory, cognition, expectation, things of this nature." And, the fact that the witnesses knew Applicant "does not change the eyeball's ability to resolve an image and send it back to the brain."

Both the State and Applicant agreed that the expert's methods were not widely known at the time of trial and that forensic visual science was not available or recognized in the late 1980's.

On remand, the trial court found that Dr. Michel relied on the application of the physiology of the eye to issues of visual identification, a forensic application of optometry which evaluates what a person could or could not see under a given set of circumstances and that such forensic visual science evidence was unavailable and undiscoverable at the time of Applicant's trial. The court concluded that the State waived its right to challenge the admissibility of forensic visual science and of Dr. Michel as an expert. Additionally, because the expert had read the trial testimony of the eyewitnesses prior to visiting the

scene, the court determined that the fact that the identifications were not stranger-on-stranger would not have changed the expert's opinion.

The court found no evidence that Edwards met Applicant, so it could not determine whether Edwards made a plea agreement after meeting Applicant in prison. The court also found no evidence supporting Edwards's testimony that Applicant had sanded his fingerprints or that Edwards had filed pre-trial motions on Applicant's behalf.

The court concluded that trial counsel was not ineffective for failing to attempt to impeach Edwards regarding his plea agreement and used sound trial strategy for not eliciting testimony showing that Van Mitchell Spencer had been ruled out as a suspect.

The court concluded that the State's issue of laches is moot in this case.

**CASELAW**

An applicant may raise either a *Herrera*-type or *Schlup*-type claim of actual innocence. *Schlup v. Delo*, 513 U.S. 298 (1995); *Herrera v. Collins,* 506 U.S. 390 (1993). The *Herrera*-type is a bare innocence claim that is based solely on newly discovered evidence. In *Herrera*, the Supreme Court instructed us to consider both the new evidence and the trial evidence and determine whether the new facts unquestionably establish the applicant's innocence. Applicants are required to meet a higher threshold to obtain relief because, when the trial has been constitutionally error free, the conviction is entitled to the utmost respect.

In a *Schlup*-type claim, innocence is tied to a showing of constitutional error at

trial. An applicant must show that the constitutional error probably resulted in the conviction of one who was actually innocent. Thus, a *Schlup* claim here depends on the validity of the *Brady* and ineffective assistance claims.

We were presented with a *Herrera*-type claim in *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996). We held that "our job is not to review the jury's verdict but to decide whether the newly discovered evidence would have convinced the jury of applicant's innocence." *Id*. at 207. If the new evidence unquestionably establishes innocence, then it must be compared to the old inculpatory evidence that was offered at trial to determine whether a rational trier of fact would acquit the applicant based on the comparison of the new and old testimony. *Id*. at 206. We stated:

> Of course, any person who has once been finally convicted in a fair trial should not be permitted to wage, and we do not permit him to wage, a collateral attack on that conviction without making an exceedingly persuasive case that he is actually innocent. It is thus entirely reasonable to insist, and we continue to insist, that an applicant for habeas relief based on a claim of actual innocence must 'demonstrate that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict and that it is probable that the verdict would be different [on retrial].'

*Id*. (citing *State ex rel. Holmes v. Court of Appeals*, 885 S.W.2d 389 (Tex. Crim. App. 1994)).

In *Ex parte Franklin*, 72 S.W.3d 671 (Tex. Crim. App. 2002), we held that when we are presented with a *Herrera*-type claim based on newly discovered evidence, our first consideration is whether the evidence presented constitutes affirmative evidence of

innocence, and only if that is provided will we move on to a determination of whether Applicant can prove by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence. *Franklin*, 72 S.W.3d at 678.

## ANALYSIS

Applicant initially raised a *Schlup*-type claim that constitutional errors probably resulted in the conviction of a man who is actually innocent. Applicant alleged a *Brady* violation, knowing use of false testimony, and ineffective assistance of counsel. However, the record supports the trial court's recommendation that relief be denied on each of these grounds. This leaves us with a bare innocence claim based on newly discovered evidence. Applicant must show that the evidence he is presenting is newly available or newly discovered and that the new evidence unquestionably establishes his innocence. Only if this is shown are we called upon to compare the new evidence with the evidence at trial in order to determine whether Applicant has shown by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence.

First, while the science of forensic visual testing may be new, the evidence Applicant relies on is not newly discovered or newly available. Shortly after the 1987 offense, investigators were able to observe the scene from the vantage point of the eyewitnesses while the conditions were similar to the way they were the night of the

offense.  The evidence gathered by investigators for both the State and the defense was presented to the jury.  The issues of lighting, distance, and the witnesses' ability to identify Applicant were raised at trial.  The jury heard the evidence regarding the streetlight in the alley, the light in the back of one of the houses, and the light in the car, as well as the defendant's evidence about how far away each witness was from the car.  Three separate juries chose to believe the witnesses.  Applicant's expert observed the scene many years later, in 2003, when the conditions from the night of the offense were unable to be replicated.  For example, Gladys Oliver's house had been torn down, there were new windows and a new fence at Cotton's house, a new shed had been built, the lighting was different, tree growth had changed after 16 years, and there was no way to ascertain exactly where in the alley the car had been on the night of the offense.  Based on this, the expert determined that it was physically impossible for the witnesses to see the face of the person exiting the car.

We agree with the State that not all scientific advances can be treated equally.  While we have considered advances in science when determining whether certain evidence, such as DNA, is newly discovered or newly available, the evidence presented by Applicant is not the sort of evidence that is capable of being preserved and tested at a later date.  Forensic visual science may be new, but there is no way for the forensic visual expert to test the conditions as they existed at the time of the offense because there is no way to replicate the lighting conditions.

We will consider advances in science and technology when determining whether evidence is newly discovered or newly available, but only if the evidence being tested is the same as it was at the time of the offense. Thus, the science or the method of testing can be new, but the evidence must be able to be tested in the same state as it was at the time of the offense.

Applicant says that "scientific evidence establishes the wrongfulness" of his conviction. However, an expert report saying that it was too dark and the car was too far away for the eyewitnesses to have seen Applicant does not affirmatively establish his innocence. All it does is attempt to discredit the witnesses who stated that they saw Applicant get out of the victim's car.

The trial court concluded that the expert's report did discredit the eyewitnesses, leaving only the testimony of Applicant's cellmate, Edwards, to support the jury's verdict. And, the trial court found Edwards's testimony not to be credible. The record, however, does not support this finding. The trial court said that Johnson's statement is more consistent with the facts of the murder and is more credible than the statement by Edwards. But Johnson said the victim fell out of the trunk of the car and died, which is inconsistent with the cause of death and the eyewitness testimony that the victim was pushed out of the car.[5] Edwards said that Applicant beat the victim repeatedly and kicked

[5]The trial court found that when the victim's BMW was in the alley, Stewart was too far from the car to identify Applicant, but the court did not rule on Stewart's testimony that he had seen the victim being pushed out of the car. Stewart did not testify at the writ hearing.

him out of the car, which is consistent with Stewart's testimony that he saw the victim get pushed out of the car and with the determination that the cause of death was multiple blows to the head. We also note that the eyewitnesses reported seeing two people exiting the car, while the version of the crime told by Johnson and Scott involved only one person–Hubbard. Despite the expert's report that the eyewitnesses were unable to make a facial recognition of the people they saw in the alley, we are confident that they would have been able to discern whether it was one or two people, which further weakens the credibility of Johnson's and Scott's statements.

Even if we determined that the evidence here was new, it does not unquestionably establish Applicant's innocence. Applicant has not met threshold elucidated in *Franklin*.

## CONCLUSION

The evidence standing alone is not dispositive of Applicant's claim of innocence. *Franklin*, 72 S.W.3d at 678. Because Applicant has not offered evidence that goes toward affirmatively proving his innocence, relief is denied.

Meyers, J.

Delivered: April 20, 2011

Publish