IN THE COURT OF CRIMINAL APPEALS


OF TEXAS


 




NO. AP-76,464






EX PARTE NEAL HAMPTON ROBBINS, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 98-06-00750-CR FROM THE


410TH JUDICIAL DISTRICT COURT OF MONTGOMERY COUNTY





 Price, J., filed a concurring opinion in which Meyers and Hervey, JJ., joined.


CONCURRING OPINION



 The applicant raises two claims in this post-conviction application for writ of habeas
corpus: actual innocence and false evidence. Each type of claim is cognizable in the post-conviction habeas context and, should they pan out, each could serve independently to defeat
the State's otherwise legitimate interest in the finality of its convictions. But, though each
finds its basis in the Due Process Clause of the Fourteenth Amendment, the two types of
claims suffice to defeat the State's finality interest for different reasons.

 A claim of actual innocence is cognizable, we have recognized, because due process
will not tolerate stigmatizing and punishing an individual who can definitively demonstrate
that he did not commit the crime for which he has been convicted. (1) Thus, actual innocence
is concerned with the accuracy of the original proceeding. If the applicant can produce new
evidence that affirmatively demonstrates his innocence (and does not simply call the State's
original evidence of his guilt into question), and, factoring that new evidence in with the trial
evidence, the habeas court concludes by clear and convincing evidence that no rational jury
would have convicted him, he is entitled to relief. (2) That is a "Herculean" burden, we have
said, (3) and it is meant to be. Otherwise, trials would cease to be the so-called "main event"
of our adversarial criminal justice system, (4) and the State would never be able to depend upon
the finality of its convictions.

 A claim of false evidence, on the other hand, is predicated less on due process
concerns with the bottom-line accuracy of the trial result and more on fundamental due
process guarantees of fairness in the main event itself. (5) If we are to afford the result of a
criminal trial a presumption of finality, then we must be able to assure defendants that, as the
main event, the trial will be conducted in as fair a manner (less than absolutely perfect) as
we can muster. There is nothing fair about a trial in which it can be shown that the State
deliberately utilized perjured, fabricated, false, or even just plain misleading evidence to
obtain a conviction. Even a defendant who is absolutely guilty--assuming we could ever
objectively know such a thing, apart from the convention of an institutional factfinder's
verdict--may obtain a new trial if his original trial was tainted by such glaring unfairness and
(in the habeas corpus context) he can establish that the unfairness more likely than not
contributed to his conviction. (6)

 But what if neither the State nor the defendant was aware that some material evidence
that was admitted at trial was perjured, fabricated, false, or misleading? In the last several
years, we have held that a habeas applicant may still obtain relief under these circumstances,
utilizing the same standard of harm (for obtaining relief in state habeas corpus proceedings)
as applies to the State's knowing use of such evidence. (7) It is not entirely clear to me,
however, in the context of the inadvertent use of such evidence, whether the primary due
process impetus is to assure the fairness of the process or the accuracy of the result (or maybe
a little of each). Is it that it strikes us as unfair to uphold a conviction that is based upon false
evidence regardless of the source of the evidence or the motive behind its admission? In
other words, is misconduct or malfeasance on the State's part unnecessary to our perception
that the process has not operated fairly? Or are we more concerned that a conviction based
upon what later turns out to be false evidence does not provide sufficient assurance that we
are stigmatizing and punishing a truly guilty defendant? While these concerns are obviously
interrelated, they are, nonetheless, distinct. And it is important, in defining whether a
particular due process claim is compelling enough to defeat the State's presumptive interest
in finality, to understand the distinction. Knowing how to set the appropriate boundaries for
what we are willing to call "false" evidence in the first instance largely depends upon which
due process rationale--fairness or accuracy--is predominant.

 I think it is fair to say that the State's inadvertent use of false evidence is not as unfair
as the State's deliberate use of false evidence. So the justification for holding that the State's
inadvertent use of false evidence may defeat its otherwise legitimate interest in finality must
hinge more on a concern for the accuracy of the result. And yet, before a concern for
accuracy may, by itself, justify undoing a criminal conviction, we have said that the habeas
applicant must satisfy the "Herculean" burden of establishing his actual innocence. (8) Unless
we are to allow our false evidence jurisprudence unduly to encroach upon our actual
innocence jurisprudence, it seems to me that when it comes to claims of the inadvertent use
of false evidence, we must not be overly liberal in how we characterize "false" evidence.

 And that brings me to the facts of the instant case. (9) Dr. Moore has renounced her trial
testimony that the cause of death was asphyxiation by compression. (10) None of the experts
who have re-examined the autopsy results and other relevant data, including Dr. Norton, is
currently willing to say that asphyxiation by compression was the cause of death. But nor
do any of the experts rule out asphyxiation by some other cause, such as suffocation, (11) and
none can rule out homicide as the manner of death. (12) Dr. Norton remains of the opinion that
the manner of death was homicide. She believes the cause of death was asphyxiation by
suffocation. The only thing demonstrably "false" about Moore's trial testimony, then, is her
opinion that the death was caused by asphyxiation by compression. We cannot say for
certain that her trial conclusions that the cause of death was asphyxiation, and that the
manner of death was homicide, were necessarily false, or even that they were mistaken. The
worst that can be said is that Moore's trial testimony left a false impression, since most of
the experts now believe that the cause of death, while it may have been some means of
asphyxiation, was not asphyxiation by compression, and that the manner of death is
"undetermined."

 On this state of the record, it is clear enough to me that the convicting court was
correct to recommend that we reject the applicant's actual innocence claim. That Moore has
changed her mind that the autopsy revealed a homicide, and now believes that the manner
of death is "undetermined," does not constitute "affirmative evidence of innocence." It
would be different, perhaps, were she now willing to testify that the manner of death was
something other than a homicide. Far from that, however, she persists in her opinion that
the death was, at least, "suspicious." By now declaring the manner of death to be
"undetermined," she only serves retroactively to impugn the State's case for the applicant's
guilt; she does not affirmatively demonstrate the applicant's innocence. No other expert has
opined that the death was not a homicide. That at least one other pathologist, Dr. Norton,
remains willing to characterize the death as a homicide--however assailable her opinion may
be--further supports the conclusion that Moore's re-evaluation does not affirmatively
demonstrate the applicant's innocence. After all, there is no new scientific breakthrough, no
new definitive study, that has convinced Moore that her original assessment of the data was
insufficiently informed from the perspective of the underlying science. Instead, she testified
that she simply changed her mind, in light of certain circumstantial facts (not related to the
autopsy) that she was unaware of in arriving at her original opinion, (13) and with the benefit
of additional professional experience since the time of the applicant's trial.

 Does Moore's apparent mistake about the specific cause of death and her subsequent
change of mind with respect to the manner of death mean that her trial testimony was
"false"? If we say that it does, it will have the consequence of entitling the applicant to post-conviction habeas corpus relief even though he has not affirmatively demonstrated his
innocence. The applicant concedes that there was no malfeasance on the prosecutor's part
in presenting Moore's (apparently) honest and sincere appraisal of the autopsy data at trial. (14) 
Should we, nevertheless, declare her trial testimony to be "false" for purposes of due process
analysis because she has since disowned it? I believe that to do so would place too high a
premium on accuracy of results as a justification for dismantling an otherwise legitimate
conviction. There was nothing unfair about the trial as it occurred. It is possible, of course,
to retroactively regard any given trial as "unfair" if new evidence--scientific, medical or
otherwise--objectively and definitively shows that good faith trial testimony was inaccurate
or false. That is the lesson of Estrada v. State. (15) But, except with respect to her testimony
as to the specific cause of death (asphyxiation by compression), proof of which is not
necessary to a conviction for the result-of-conduct offense of capital murder, (16) it has not
objectively and definitively been established that Moore's trial testimony was inaccurate or
false. It was a medical/scientific opinion, based upon her education, training and experience-as-of-that-time. That she has since recanted it does not necessarily mean it was inaccurate
or false, either now or when she expressed it at trial. Even now, she is unwilling to say that
the manner of death was not homicide--only that, based on the data, she cannot currently say
that it was. To call Moore's testimony "false" under these circumstances, and thereby grant
the applicant habeas relief out of an overriding concern for the accuracy of the result, is
essentially to grant an actual innocence claim without requiring the applicant to satisfy the
usual "Herculean" burden.

 With these supplemental comments, I join the Court's opinion.


FILED: June 29, 2011

PUBLISH
1. Ex parte Elizondo, 947 S.W.2d 202 (Tex. Crim. App. 1996).
2. Ex parte Franklin, 72 S.W.3d 671, 677 (Tex. Crim. App. 2002).
3. Ex parte Brown, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006).
4. Wainwright v. Sykes, 433 U.S. 72, 90 (1977).
5. E.g., Mooney v. Holohan, 294 U.S. 103, 112 (1935) (due process is offended "if a state has
contrived a conviction through the pretense of a trial which in truth is but used as a means of
depriving a defendant of liberty through a deliberate deception of court and jury by the presentation
of testimony known to be perjured. Such a contrivance by a state to procure the conviction and
imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the
obtaining of a like result by intimidation.").
6. Ex parte Fierro, 934 S.W.2d 370 (Tex. Crim. App. 1996).
7. Ex parte Chabot, 300 S.W.3d 768, 771 (Tex. Crim. App. 2009); Ex parte Napper, 322
S.W.3d 202, 242 (Tex. Crim. App. 2010).
8. Ex parte Brown, supra.
9. What follows in this paragraph are uncontroverted facts as gleaned from the habeas record
and consistent with the convicting court's recommended findings of fact entered at the conclusion
of the protracted habeas corpus proceedings.
10. The applicant nowhere argues that Moore was not a qualified expert at the time of trial for
purposes of the Rules of Evidence. Tex. R. Evid. 702.
11. The applicant was charged with and convicted of capital murder. Capital murder is "a result-of-conduct oriented offense." Roberts v. State, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008). The
indictment alleged that the applicant "intentionally and knowingly cause[d]" the victim's death "by
asphyxiating" her. It did not allege--and need not have alleged for purposes of charging a complete
offense--how the asphyxiation was accomplished, and the State's ability to convict the applicant
was not contingent on proof of any particular means of asphyxiation.
12. See Sanchez v. State, ___ S.W.3d ___, 2010 WL 3894640 (Tex. Crim. App., No. PD-0961-07, delivered Oct. 6, 2010) (Slip op. at *6) ("In medicine, every death is in one of four 'manners': 
natural, accidental, homicidal, or suicidal"); & id. n.31 ("National Association of Medical Examiners
and The College of American Pathologists, 'Medical-Legal Death Investigation and Autopsy' (2003)
(defining 'Manner of Death' as 'The circumstance surrounding death, such as: natural, accident,
suicide, homicide, undetermined, or pending.'").
13. During her deposition, Moore testified:


 Q. What is it that - what factually can you point me to in your medical
findings or your autopsy findings that caused you to change your opinion?


 A. It's not really the medical that's changed. It's when I reviewed the whole
file and reviewed the testimonies and the EMT reports and the medical records that
made me change my opinion, and that's listed in my affidavit.


At trial, Moore had testified that CPR performed on the child-victim could not have been the cause
of certain bruising found on the child-victim's back that led her to believe that the child-victim had
suffered violence at the hands of an adult. These circumstances suggested asphyxiation by
compression as the cause of death and homicide as the manner of death. See Majority opinion at 29
("Well, back then I did believe that the bruising on the back and the chest compressions was what
caused the baby; so, I believed that was caused by another person. That's what I believed back then,
but I don't believe that now."). In her affidavit, Moore explained that, after reviewing the case file
and other trial testimony, none of which she had been aware of at the time of trial, she concluded that
the circumstances of the CPR were such that it could have caused those bruises after all. 
14. In its recommended findings of fact, the convicting court observed:


 Dr. Moore's trial opinions as to cause and manner of death were not true. 
They were based on false pretenses of competence, objectivity, and underlying
pathological reasoning that were not given in good faith. They were admittedly not
justified by the objective facts and pathological findings in this case. Her trial
opinions in this case were expert fiction calculated to attain a criminal conviction .
. .


 Dr. Moore's giving scientifically unsupported testimony at a time when she
was biased toward the State and unqualified to render opinions on the issues involved
in this case equates to her giving false testimony, or at least giving a false impression
that was of such a nature as to contrive a conviction through the pretense of a trial
which in truth was a deception of the Court and jury.


 While the State could not have known at the trial of the falsity of Moore's
testimony, due to her public position and agency relationship with the State, her
knowingly giving false testimony equates to the giving or allowing of false testimony
by the State.


While there is more than sufficient evidence in the record to support the convicting court's doubt
about the "competence, objectivity, and underlying pathological reasoning" underlying Moore's trial
testimony, I do not find much support for the propositions that she did not give it in good faith, that
it was consciously "biased," and that it constituted "expert fiction calculated to attain a criminal
conviction." It is true that, during her deposition, Moore acknowledged that Dr. Joye Carter, the
Chief Medical Examiner in Harris County when Moore was employed there at the time of the
applicant's trial, had found it necessary to admonish Moore that she should "never be in a position
where it is perceived that the medical examiner is a witness for one particular side." Moreover,
Moore also endorsed Carter's observation that "during this time period [Moore] was making a
transition from pediatric pathologist to the neutral position of a forensic pathologist." Moore also
admitted that there were at least two other cases at that time in which she concluded that a particular
infant's death was a homicide, only later to change her finding to "undetermined." But Moore
nowhere admitted that she gave consciously biased or bad faith testimony at the applicant's trial, and
I do not believe this evidence establishes that Moore's trial testimony was "knowingly" false, as the
convicting court recommends that we find. As I observed recently, "[t]his Court is the 'ultimate'
factfinder [in post-conviction habeas corpus proceedings], with the prerogative to reject the
convicting court's recommendations on those rare occasions when we deem it appropriate, even
when they are supported by the record, if we think another disposition is manifestly better supported
by the record." Ex parte Spencer, 337 S.W.3d 869, 2011 WL 1485448 (Tex. Crim. App., No. AP-76,244, decided April 20, 2011) (Price, J., concurring), at *10 n.1. I would exercise that prerogative
to find that Moore did not knowingly testify falsely, but at most inadvertently injected an
inaccuracy--that the cause of death was asphyxiation by compression--and a misimpression--that
the manner of death could be determined to be homicide--into the trial.
15. 313 S.W.3d 274, 286-88 (Tex. Crim. App. 2010) (due process violation resulted from the
admission of inaccurate testimony from State's witness with respect to inmate-classification status
for capital murder defendant were he to be assessed a life-without-parole sentence, where both
parties agreed that the inaccuracy was inadvertent, not intentional).
16. See n.11, ante.