IN THE COURT OF CRIMINAL APPEALS


OF TEXAS


 




NO. WR-37,658-03






EX PARTE JAMES LEE HENDERSON, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 181CR1293 FROM THE


102ND DISTRICT COURT OF RED RIVER COUNTY





 Price, J., filed a dissenting statement in which Johnson and Alcala, JJ.,
joined. 


DISSENTING STATEMENT



 The applicant filed his third post-conviction application for writ of habeas corpus
under Article 11.071 of the Code of Criminal Procedure in March of 2004, raising for the
first time an Atkins claim, asserting that he may not be executed consistent with the Eighth
Amendment because he suffers from mental retardation. (1) We concluded that his pleading
established a prima facie case for mental retardation and permitted him to proceed under
Section 5, but we ultimately denied him relief on the merits of his Atkins claim on January
25, 2006. (2) Judge Cochran filed a concurring statement at that time, joined by three other
judges (including myself), in which she opined that the mental retardation issue was "a close
question[.]" (3) "Although there was evidence in this record indicating that applicant was
mentally retarded, there was also significant evidence showing that he was not. Either
finding is supportable by the record evidence." (4) Under these circumstances, we typically (but
not invariably) defer to the convicting court's recommended findings and conclusions. (5)

 This Court has the authority, on its own motion, to revisit its disposition of post-conviction habeas corpus applications, but we do so only "under the most extraordinary of
circumstances[.]" (6) The applicant has filed a suggestion that we reconsider our 2006
disposition of his initial Atkins writ application. Although it remains "a close question," I
believe that the risk that our original disposition of the applicant's Atkins claim was incorrect
is sufficiently dire as to merit another look.

 At the evidentiary hearing in September of 2004, the applicant presented testimony
from psychologist Dr. Susana Rosin. She conducted IQ testing as well as standardized
testing to measure the applicant's adaptive deficits. (7) She derived a full-scale IQ score for the
applicant of 66, well within the range of mild mental retardation. She found adaptive deficits
in at least two of the diagnostic criteria, namely, "self-direction, work skills, safety, and
academic skills," according to the convicting court's findings of fact from the September
2004 hearing. (8) In Rosin's opinion, the applicant was mentally retarded, and although she
could point to no standardized testing on the applicant from before his eighteenth birthday,
she extrapolated from existing data to conclude that he had functioned at a mild level of
mental retardation since before that time. (9)

 The convicting court discounted Rosin's testimony on essentially two bases. First,
although Rosin detected no signs of malingering on the applicant's part during her testing,
the convicting court noted that the applicant had a motive to malinger, having "learned that
establishing himself as mentally retarded could save his life." (10) Second, Rosin's IQ testing
was contradicted by limited IQ testing that was conducted on the applicant when he arrived
on death row, as construed by prison psychologist Dr. Michael Gillhausen. (11) It is
Gillhausen's testimony, extrapolating from that limited prison-administered IQ test, that the
applicant principally challenges in his present suggestion that we revisit our original
disposition of his Atkins writ.

 When the applicant arrived on death row, sociologist Steve Gilliland subjected him
to a short form of an earlier version of the Wechsler, the WAIS-R, and obtained a full-scale
score of 83. As Judge Cochran summarized in her concurring statement in 2006, Gillhausen
testified at the 2004 hearing

 that the reliability of the short form WAIS-R is 94% which is "very
acceptable." The reliability of applicant's 83 I.Q. score "would allow us to
state that his I.Q. would fall within the range from seventy-six to ninety, about
ninety-five percent of the time, so that's fairly close." (12)


The applicant now argues that "Dr. Gillhausen's testimony is demonstrably inaccurate based
upon the very support upon which he relied for his conclusion, [a treatise entitled]
Assessment of Children." (13) This treatise was admitted into evidence at the 2004
evidentiary hearing, but we took no note of it in our order denying Atkins relief, nor did
Judge Cochran mention it in her concurring statement. The applicant now argues that
Assessment of Children establishes that Gillhausen used the wrong coefficient--the
reliability coefficient--to testify that there is a ninety-five percent probability that the
applicant would obtain a full-scale score of 76 or above on the WAIS-R. But that is not what
the reliability coefficient actually measures, he claims, according to Assessment of
Children. Instead, the reliability coefficient measures the likelihood that, if the applicant
took the same two subtests of the WAIS-R, he would score between 76 and 90 ninety-five
percent of the time. What Gillhausen should have applied, the applicant now contends, was
something called the validity coefficient, which, as the applicant describes it, "refers to the
extent to which [the short-form version of the WAIS-R] measures what it is suppose[d] to
measure[,]" namely, the applicant's actual full-scale IQ score as would have been determined
had he been administered the WAIS-R as a whole. (14) As the applicant now summarizes:

 Dr. Gillhausen's testimony did not address the validity of the short form I.Q.
test. However, the reference material upon which Dr. Gillhausen relied,
Assessment of Children, does address the "validity" of short form I.Q. tests. 
The two-subtest short form WAIS-R (specifically, the vocabulary verbal and
the block design performance subtests) has a validity coefficient of .90. Using
the very reference relied upon by Dr. Gillhausen, Assessment of Children,
Dr. Steven LoBello, an expert on short form I.Q. tests, demonstrates that, with
a validity coefficient of .90 and Mr. Gilliland's short form assessment of 83,
there is a 95% probability that [the applicant] would have earned a full-scale
I.Q. in a range of 66 to 92 had he taken the complete WAIS-R. From this
calculation, Dr. Steven LoBello demonstrates that Mr. Gilliland's I.Q. short
form assessment of 83 is consistent with Dr. Rosin's full scale I.Q. assessment
of 66 and a finding of mild mental retardation. (15)


In other words, Gillhausen's opinion, so important in impeaching Rosin's conclusion that the
applicant suffers from mental retardation, was inaccurate, based as it was upon the wrong
metric.

 The applicant's Atkins writ was brought pro bono by the attorney who had been
appointed to represent the applicant for purposes of his federal habeas proceedings after his
initial state writ application (filed pre-Atkins) was denied. At the conclusion of the
evidentiary hearing of his Atkins claim in 2004, federal counsel attempted to obtain a copy
of the transcript of the hearing from the court reporter, but it was never made available to
him. The convicting court apparently entered recommended findings of fact and conclusions
of law and forwarded the Atkins application to this Court without waiting for proposed
findings and conclusions from the parties, as contemplated by Article 11.071, Section 9(e). (16) 
Proceeding into federal court, the applicant obtained affidavits from LoBello, (17) as well as
affidavits from two other experts, Drs. Anthony Thompson and Richard Garnett, (18) pointing
out the flaw in Gillhausen's testimony at the 2004 Atkins hearing. Because these affidavits
were not presented in the state court hearing, however, the federal courts are currently unable
to pay them any heed, given the Supreme Court's holding in Cullen v. Pinholster. (19) 
Accordingly, the applicant filed a motion in federal court to stay and abate further federal
proceedings in order to pursue the instant suggestion that we reconsider his initial Atkins writ
application on our own motion. (20)

 Gillhausen's mistaken metric is not the only circumstance that leads me now to doubt
our original disposition of the applicant's Atkins claim. In her concurring statement in 2006,
Judge Cochran also gave some weight to the following declaration, designated a conclusion
of law, by the convicting court: "Although the Trial Court cannot articulate with expertise
a definition and identification of mental retardation, the court concludes that it can identify
it when it sees it; the court has not observed mental retardation in [the applicant]." (21) Since
denying relief on the applicant's Atkins claim, however, we have espoused the propriety of
maintaining "a healthy scepticism" for such unvarnished judicial intuitions about mental
retardation, calling into question the kind of I-can't-define-it-but-I-know-it-when-I-see-it
determination that the convicting court foisted upon us here. (22) For my part, I have elsewhere
registered my own considerable scepticism of lay opinions about what does and does not
constitute mental retardation, which are often divorced from the actual diagnostic criteria that
the Supreme Court clearly had in mind when it declared a national consensus for prohibiting
execution of mentally retarded offenders in Atkins. (23) I suspect that the convicting court here
fell into the common mistake, for example, contrary to diagnostic practice, of gauging the
adaptive deficits prong of the diagnostic criteria for mental retardation according to its own
perception of the applicant's evident adaptive strengths, not his demonstrated adaptive
weaknesses as revealed by Rosin's Vineland results. (24)

 All told, the applicant's Atkins claim presents an even closer question than we thought
it did in 2006. I am persuaded that the probability that we reached an incorrect conclusion
on original submission is sufficiently substantial that I would take the admittedly
extraordinary step of agreeing to reconsider on our own motion our disposition of the
applicant's initial Atkins writ application. If nothing else, our opening the case back up and
allowing the applicant to submit his expert affidavits could conceivably permit the federal
courts to take that evidence into account in deciding whether our disposition was either "an
unreasonable application of" Supreme Court precedent (i.e., Atkins), or "based on an
unreasonable determination of the facts in light of the evidence presented in the State court
proceeding." (25) Especially given our apparent failure to comprehend the significance of the
evidence that was before us with respect to the Assessment of Children treatise, it seems
only fair that we should take a second, more probing look now. If, withal, we persist in our
rejection of the applicant's Atkins claim, at least our second look might allow the federal
courts to take into account everything that we have considered, early and late, relevant to
informing that judgment. (26) Because the Court will not, I respectfully dissent.


FILED: February 26, 2014

DO NOT PUBLISH
1. Tex. Code Crim. Proc. art. 11.071; U.S. Const. amend. VIII; Atkins v. Virginia, 536 U.S.
304 (2002).
2. Ex parte Henderson, 2006 WL 167836 (Tex. Crim. App. Jan. 25, 2006) (not designated for
publication).
3. Id. at *1 (Cochran, J., concurring, joined by Keller, P.J., and Price and Johnson, JJ.).
4. Id. at *4.
5. In the context of post-conviction habeas corpus, the convicting court is the "original" fact-finder, and we ordinarily pay great deference to that court's findings of fact and conclusions of law
when supported by the record. But that deference is not boundless, and we do not simply rubber-stamp the convicting court's recommendations. This Court is the "ultimate" fact-finder, with the
prerogative to reject the convicting court's recommendations on those rare occasions when we deem
it appropriate, even when they are supported by the record, if we think another disposition is
manifestly better supported by the record. Ex parte Butler, __ S.W.3d __, 2012 WL 2400634, at *11
(Tex. Crim. App. June 27, 2012) (Price, J., dissenting); Ex parte Spencer, 337 S.W.3d 869, 880 n.1
(Tex. Crim. App. 2011) (Price, J., concurring); Ex parte Robbins, 360 S.W.3d 446, 467 n.14 (Tex.
Crim. App. 2011) (Price, J., concurring).
6. Ex parte Moreno, 245 S.W.3d 419, 427 (Tex. Crim. App. 2008).
7. In January of 2004, Rosin administered the Wechsler Adult Intelligence Scale III and the
Vineland Adaptive Behavior Scales. Henderson, 2006 WL 167836, at *2 (Cochran, J., concurring).
8. Findings of Fact and Conclusions of Law Nos. 15, 26. See also In re Henderson, 462 F.3d
413, 416 (5th Cir. 2006) ("It was Dr. Rosin's expert opinion that [the applicant] has adaptive
behavior deficits in self-direction, work skills, safety and academic skills."); id. at n.2 ("According
to Dr. Rosin, a diagnosis of mental retardation requires the demonstration of adaptive deficits in at
least two of the following areas: communication, self-care, home living, social/interpersonal, use of
community resources, self-direction, work skills, functional academic skills, health and safety."); 
Henderson v. Dir., TDCJ-CID, No. 1:06-CV-00507, 2013 WL 4811223, at *10 (E.D. Tex. Sept. 6,
2013) (not designated for publication) (quoting Finding of Fact No. 26).
9. See Henderson v. Dir., TDCJ-CID, 2013 WL 4811223, at *8 (quoting Rosin's testimony
with respect to onset prior to age 18, noting the absence of evidence of accident, illness, or head
trauma that might account for a drop in IQ after that time).
10. Henderson, 2006 WL 167836, at *4 (Cochran, J., concurring) (quoting Finding of Fact No.
20).
11. Id. at *3.
12. Id.
13. Suggestion for Reconsideration at 18 (citing excerpts from Jerome M. Sattler, Assessment
of Children 25-26, 30-31 (3d ed. 1998)).
14. Id. at 19.
15. Id. at 19-20 (record citations omitted).
16. Tex. Code Crim. Proc. art. 11.071, § 9(e).
17. In one affidavit, LoBello explains:


 The reliability factor only tells this Court what [the applicant] would likely score if
he were to retake the same, identical two-subtest short-form test that Mr. Gilliland
had previously administered, i.e., [the applicant] would likely score within a range
from 76-90 about ninety-five percent of the time when taking the same short-form
test. The short-form test does not equate to how [the applicant] would have scored
if he had taken a full and complete I.Q. test. The reliability factor does not address
whether the short-form test accurately estimated [the applicant's] I.Q. Dr.
Gillhausen's testimony did not address the validity of the short-form I.Q. test.


In another affidavit, LoBello asserted that, applying the validity coefficient instead of the reliability
coefficient, and beginning "from Mr. Gilliland's short-form assessment of 83 . . ., there is a 95%
probability that [the applicant] would have earned a Full Scale I.Q. between the scores of 66 and 92
had he taken the complete WAIS-R."
18. These latter affidavits express general agreement with LoBello's conclusions, without
specifically addressing whether Gillhausen applied the wrong coefficient.
19. 131 S.Ct. 1388, 1401 (2011). See Henderson v. Dir., TDCJ-CID, 2013 WL 4811223, at
*13-14 (noting that it must take the record of the state proceedings as they come, under Pinholster,
the federal district court observed with respect to the applicant's arguments on original submission
that Gillhausen was using the wrong metric that, "[t]o the extent that [the applicant] supported his
argument with affidavits that were not presented to the State court, such affidavits are irrelevant").
20. At the time that he filed his suggestion for reconsideration in this Court, the applicant also
filed motions to vacate the federal district court's judgment, under Rule 59(e) of the Federal Rules
of Civil Procedure, and to stay and abate further federal proceedings until this Court rules on his
present suggestion for rehearing. Fed. R. Civ. P. 59(e). The federal district court denied both
motions on December 6, 2012. Still, in its memorandum opinion denying relief on the applicant's
Atkins claim, the federal district court granted a certificate of appealability, authorizing appeal to the
Fifth Circuit. Henderson v. Dir., TDCJ-CID, 2013 WL 4811223, at *17. It is conceivable that, if
this Court were to entertain the applicant's suggestion to reconsider his initial Atkins writ and allow
him to supplement the state court record, the Fifth Circuit would remand the cause to the federal
district court for further proceedings in light of that supplementation. Even if the applicant cannot
improve his position in federal court, the probability that we ruled incorrectly on our original
consideration of the applicant's Atkins claim justifies our reconsideration, in my opinion. 
21. Henderson, 2006 WL 167836, at *4 (Cochran, J., concurring) (quoting Conclusion of Law
No. 44); Henderson v. Dir., TDCJ-CID, 2013 WL 4811223, at *11 (same).
22. See Ex parte Van Alstyne, 239 S.W.3d 815, 821-23 (Tex. Crim. App. 2007) (rejecting the
view of the dissenting judges that we should exercise our authority as ultimate fact-finders in post-conviction habeas proceedings and, based upon nothing more than our own review of the applicant's
demeanor during the course of a media interview, reject the convicting court's recommendation that
we find him to be mentally retarded--even though none of the mental-health experts purported to
be able to make a determination with respect to mental retardation based on that factor alone).
23. Lizcano v. State, 2010 WL 1817772, at *32-40 (Tex. Crim. App. June 30, 2010) (Price, J.,
concurring and dissenting, joined by Johnson and Holcomb, JJ.) (not designated for publication); 
see id. at 35 (lamenting, inter alia, that "[i]n failing . . . to anchor the fact-finder's decision [with
respect to mental retardation] on the specific diagnostic criteria, we seem to have granted a certain
amorphous latitude to judges and juries in Texas to supply the normative judgment--to say, in
essence, what mental retardation means in Texas (and, indeed, in the individual case) for Eighth
Amendment purposes"); id. ("It would be anomalous to allow the fiat of the fact-finder to
undermine the essentially diagnostic character of the inquiry.").
24. See id. at *37 (adaptive strengths may coexist with adaptive deficits, and "the presence of
a strength in a particular area does not negate the coexistence of a limitation in another area of
sufficient significance to establish the adaptive behavior component of the mental retardation
definition") (citing Peggy M. Tobolowsky, Atkins Aftermath: Identifying Mentally Retarded
Offenders and Excluding Them From Execution, 30 J. Legis. 77, 97 (2003) (which in turn cites
AAMR, Mental Retardation: Definition, Classification, and Systems of Support 48 (10th ed. 2002)); 
see also Holladay v. Allen, 555 F.3d 1346, 1363 (11th Cir. 2009) ("Individuals with mental
retardation have strengths and weaknesses, like all individuals. Indeed, the criteria for diagnosis
recognizes this by requiring a showing of deficits in only two of ten identified areas [in APA,
Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)] of adaptive functioning.").
25. 28 U.S.C. § 2254(d)(1)-(2); see also id. § (e)(1) (federal petitioner must rebut presumption
of correctness of state court ruling by clear and convincing evidence). See Henderson v. Dir., TDCJ-CID, 2013 WL 4811223, at *12 (measuring the applicant's Atkins claim against the standard set out
in 28 U.S.C. § 2254(d)); id. at *14 ("Based on the evidence actually presented during the Atkins
hearing [in state court], the State court found that Dr. Gillhausen was credible and accepted his
testimony. [The applicant] has not rebutted the presumption of correctness of the State court's
findings by clear and convincing evidence.").
26. See note 20, ante.