

# NUMBER 13-18-00457-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF A.B.V., A CHILD

On appeal from the 267th District Court
of Victoria County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Hinojosa
Memorandum Opinion by Justice Hinojosa**

Appellee the Texas Department of Family and Protective Services (the Department) filed a petition to terminate the parental rights of appellant A.N.V.[1] (Mother) to her child A.B.V. After a jury trial, the trial court rendered judgment terminating Mother's parental rights. By two issues, Mother argues that: (1) the evidence is legally

---

[1] In appeals involving the termination of parental rights, the Texas Rules of Appellate Procedure require the use of an alias to refer to a minor. TEX. R. APP. P. 9.8. We may also use an alias "to [refer to] the minor's parent or other family member" to protect the minor's identity. *Id.*

and factually insufficient to demonstrate grounds for termination; and (2) she received ineffective assistance of counsel. We affirm.

## I. BACKGROUND

### A. A.B.V. Experiences Health Issues

Mother is a registered nurse with three children, the youngest of whom is A.B.V. A.B.V. was born on August 4, 2016 and developed normally for the first months of her life. In December, Mother brought A.B.V. to the doctor to treat a cough and an ear infection. While there, A.B.V. was accidentally administered an HPV vaccine intended for her older brother.

Months later, A.B.V.'s condition declined, and on February 16, 2017, she was admitted to Texas Children's Hospital (TCH). A.B.V. was underweight and suffering from hyponatremia, a potentially fatal condition evidenced by dangerously low sodium levels. Despite extensive testing, doctors could not determine what was causing A.B.V.'s condition. Doctors gave A.B.V. a saline IV and a feeding tube, and her condition improved. She was discharged five days later. In early March, A.B.V.'s primary care physician removed the feeding tube.

On March 17, Mother brought A.B.V. to Citizen's Medical Center. A.B.V. remained underweight, and she again had dangerously low sodium levels. After admission, her condition stabilized and her sodium levels improved, though doctors could not reach any definitive diagnosis. A.B.V. was discharged on March 22.

On April 21, Mother again took A.B.V. to TCH. A.B.V. once more presented as malnourished, underweight, and having dangerously low sodium levels. Extensive testing revealed no underlying medical cause for A.B.V.'s problems.

2

**B.    Department Intervention**

During the April hospitalization, doctors notified the Department that they suspected Mother was either intentionally depriving A.B.V. of necessary nutrients or giving her diuretics.   On May 2, the Department intervened and separated Mother from A.B.V., with Mother having only supervised visitation.   A.B.V.'s condition improved, and she was discharged on May 18 to foster care placement.   The Department placed A.B.V. with her maternal grandmother on June 6.

On June 30, A.B.V.'s blood tests revealed her sodium level was 130, just below the normal range of 135 to 145.   Then, on July 2, A.B.V. had a supervised visitation with Mother.   The next day, A.B.V. became critically ill, and she was life-flighted to TCH. Doctors found her to once again have dangerously low sodium levels.   Once again, A.B.V.'s condition improved while hospitalized.

A.B.V. was discharged to foster care on July 20, and Mother's supervised visitations were discontinued.   From that point, A.B.V. steadily gained weight, and her previous problems with dangerously low blood sodium have not since recurred.   In April of 2018, A.B.V. was placed with her paternal grandparents, and she remains in good health.   The Department's petition to terminate parental rights was tried to a jury in June of 2018.

**C.    Doctor Testimony**

**1.    Dr. Paul**

David Leo Paul, M.D., a pediatric endocrinologist at TCH, consulted on A.B.V.'s care during her second hospitalization in April of 2017.   Dr. Paul evaluated A.B.V. for

3

severely low sodium levels. He explained that the condition, referred to as hyponatremia, results in excessive water in the body relative to sodium. If left untreated, a patient with hyponatremia could suffer a cerebral edema, a potentially lethal injury. Dr. Paul observed nothing in A.B.V.'s medical history that would suggest a reason for A.B.V.'s condition.

Dr. Paul opined that A.B.V. was not receiving proper nutrition such as formula or breast milk. Instead, he believed that A.B.V. was receiving low sodium fluid such as water, diluted milk, or diluted juice. Dr. Paul determined that A.B.V.'s condition was chronic, meaning that A.B.V. had not been receiving adequate nutrition for days if not weeks. Dr. Paul learned that A.B.V. was accidentally administered the HPV vaccination, but he was unaware of any reported instance of an HPV vaccination causing hyponatremia.

Dr. Paul stated that Mother reported difficulties with breastfeeding and bottle feeding during previous hospitalizations. He also noted that Mother did not agree with suggestions that she bottle feed A.B.V. while in the hospital. He stated that after Mother was removed from the hospital, A.B.V. had no issues with bottle feeding, and her condition improved.

### 2. Dr. Isaac

Reena Isaac, M.D., is a pediatrician with TCH's child protection medical team. A.B.V.'s primary care team asked Dr. Isaac to evaluate whether A.B.V. was a victim of medical child abuse. Dr. Isaac noted concerns with Mother's resistance to medical recommendations. In particular, Mother did not cooperate with efforts to quantify how

much fluid A.B.V. was receiving from bottle feeding. Mother also did not cooperate with the lactation consultant's efforts to determine how much breast milk Mother was producing.

Dr. Isaac stated that Mother persistently referenced the administration of the HPV vaccine to medical staff as having caused A.B.V.'s condition. According to Dr. Isaac, the Center for Disease Control reports that common adverse events associated with the HPV vaccine include fever, headache, and other mild reactions, which tend to disappear after several days. Dr. Isaac stated that no adverse events were reported in 75% of the eighty-eight reports of infants receiving an accidental HPV vaccine—the remaining events constituted non-serious adverse reactions such as fever, vomiting, and diarrhea.[2]

Regarding the removal of A.B.V.'s feeding tube in March of 2017, Dr. Isaac learned that Mother told A.B.V.'s primary care physician that the removal was recommended by doctors at the hospital; conversely, Mother told doctors at the hospital that the removal was recommended by A.B.V.'s primary care physician.

Dr. Isaac recommended a trial separation so that the medical team could adequately assess A.B.V.'s capacity to feed. Dr. Isaac stated that, after Mother was removed from the hospital, "we were able to see that the baby took the bottle beautifully, gained weight very quickly and actually began to thrive."

Dr. Isaac commented on A.B.V.'s readmission following placement with the maternal grandmother:

> During that time, again, our understanding is that the maternal grandmother had the baby that month but mom was still in the vicinity, close vicinity of

---

[2] Dr. Isaac relied on reports made to the "Vaccine Adverse Event Reporting System," which allows physicians and caretakers to report adverse reactions to vaccinations.

the maternal grandmother. At one point our reports were that she lived very nearby, if not next door. And—and the concern is that she continued to have some sort of maternal influence on [the care of A.B.V.]

Based on her observations, Dr. Isaac concluded that A.B.V. was a victim of medical child abuse.

### 3. Dr. Lukefahr

James Lukefahr, M.D., a child abuse pediatrician with the University of Texas Medical School in San Antonio, reviewed A.B.V.'s medical records at the Department's request. Dr. Lukefahr described A.B.V.'s condition as a "failure to thrive" and "multiple episodes where her serum sodium level dropped to dangerous levels." Dr. Lukefahr suspected that A.B.V.'s condition was caused by the administration of excessive amounts of water and not enough protein or other nutrients. He explained that "the pattern was repeatedly demonstrated to the point that there's no question that these conditions or these problems only occurred when [Mother] was around." He further explained, "whenever [A.B.V.] was not in [Mother or maternal grandmother's] care she gained weight very briskly and her sodium levels and all of her other electrolyte levels remained completely normal." Dr. Lukefahr concluded that A.B.V.'s condition resulted from Mother's abuse.

## D. Mother's Mental Evaluations

### 1. Dr. Jain

Ashok Jain, M.D., a forensic psychiatrist, performed Mother's court-ordered psychiatric evaluation. Dr. Jain testified that Mother "exhibited significant entitlement and narcissm." He diagnosed Mother as suffering from various psychological disorders,

6

including one disorder referred to interchangeably as either "Munchausen syndrome by proxy" or "factitious disorder imposed on another" (FDIA). Dr. Jain explained that FDIA manifests itself where a caregiver intentionally causes another—usually a young child—to become ill in order to benefit herself, such as by obtaining sympathy and attention. Dr. Jain testified that the common thread in FDIA cases is an unexplained pattern of illnesses and hospitalizations that ceases once the parent is removed from the situation.

### 2. Dr. Chadwick

Terri Chadwick, Ph.D., a licensed psychologist, performed a psychological evaluation of Mother. Dr. Chadwick concluded that Mother was "suffering from several clinical features that [were] impacting her ability to parent [A.B.V.]" In particular, Dr. Chadwick determined that Mother showed symptoms of anxiety, emotionality, repressed anger, and a personality disorder with features of narcissistic and antisocial attitudes.

### E. Mother's Evidence

Shayna Reyna, a registered nurse at Citizen's Hospital, testified that Mother was cooperative and her conduct towards A.B.V. was normal and appropriate. Reyna testified that Mother offered to breastfeed, and she supplemented A.B.V.'s diet with formula when directed by medical staff. According to Reyna, Mother also fed A.B.V. by syringe. On cross-examination, Reyna agreed it was somewhat concerning that there had been no medical issues since Mother was denied access.

Dana Harrison was Mother's counselor, and she had seen her twenty-two times since August 10, 2017. She took issue with Dr. Ashok's diagnosis of FDIA because it was based "on an assumption that the information that he received was true[.]"

7

Sharon Swize testified that she works with Early Childhood Intervention, an organization that provides services to children with developmental delays. Swize worked with Mother in March and April of 2017. Swize observed no overt signs of physical abuse. She testified that Mother consistently met her appointments with Early Childhood Intervention and that Mother took care in documenting her efforts to feed A.B.V. According to Swize, Mother looked into procuring milk from a "milk bank" and improving her own breastfeeding technique. Mother also reported having administered "liver detox" pills to A.B.V. without consulting a pediatrician, which concerned Swize. Swize stated that she continued to see A.B.V. through the time of trial, and that she agreed that A.B.V. had shown greater progress outside of Mother's care.

A.B.V's maternal grandmother testified that after the Department intervened on May 2, 2017, Mother was only allowed to see A.B.V. during supervised visitations at a location designated by the Department and watched over by Department employees. Maternal grandmother stated that she never allowed Mother to see A.B.V. outside of those supervised visitations.

Sylvia Hernandez, Mother's friend, testified that she often took care of A.B.V. during the early months of A.B.V.'s life. According to Hernandez, A.B.V. had no trouble taking her bottle while in her care. However, Hernandez stated that after the HPV shot, she noticed that A.B.V. was not eating and her eyes were "droopy."

Mary Jane Martinez, a friend of Mother, testified that she saw Mother breastfeed A.B.V., and she also saw A.B.V. develop normally over the first months of her life. According to Martinez, there was nothing out of the ordinary about A.B.V. until she was

8

vaccinated against HPV, but afterward she saw A.B.V. in the hospital looking lethargic, weak, and not wanting to eat.

## F.     Jury Verdict

The jury was instructed to consider whether the Department had established at least one of three statutory termination grounds[3] and whether termination was in A.B.V.'s best interest.   The jury returned a general verdict that Mother's parental rights should be terminated, and the trial court rendered judgment accordingly.   This appeal followed.

## II.     SUFFICIENCY OF THE EVIDENCE

By her first issue, Mother argues the evidence is legally and factually insufficient to show statutory grounds for termination.

## A.     Standard of Review

The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered.   *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).   In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding.   *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).   Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true.   *Id.*

---

[3] Those grounds are as follows:   (1) whether Mother knowingly placed or knowingly allowed A.B.V. to remain in conditions or surroundings which endangered the physical or emotional well-being of A.B.V., *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West, Westlaw through 2017 1st C.S.); (2) whether Mother engaged in conduct or knowingly placed A.B.V. with persons who engaged in conduct which endangered the physical or emotional well-being of A.B.V., *see id.* § 161.001(b)(1)(E); or (3) whether Mother failed to comply with her family service plan, which prescribed tasks that Mother was to complete to obtain the return of A.B.V.   *See id.* § 161.001(b)(1)(O).

9

We perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). If, in weighing disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the allegations constituting the grounds for termination were true, then the evidence is factually sufficient, and the termination findings must be upheld. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). On the other hand, evidence is factually insufficient if the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d at 266.

## B. Applicable Law

Because of the fundamental rights at issue, due process requires that parental termination be supported by clear and convincing evidence. *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.); *In re J.F.C.*, 96 S.W.3d at 264.

Before parental rights may be involuntarily terminated, the trier of fact must find two elements by clear and convincing evidence: (1) that the parent committed one of the statutory grounds for termination found in section 161.001(b)(1) of the family code; and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b) (West, Westlaw through 2017 1st C.S.); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

Relevant to this proceeding, section 161.001(b)(1) provides that termination of parental rights is warranted if the trier of fact finds by clear and convincing evidence, in addition to the best interest finding, that the parent has:

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; [or]

. . . .

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) & (O).

## C. Analysis

Because only one statutory ground is necessary to support termination, we first focus our attention on section 161.001(b)(1)(E). Subsection E uses the term "endanger," which means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *See In re S.R.,* 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *Id.* (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary,

11

deliberate, and conscious course of conduct by the parent. *Id*.

The Department presented the testimony from three medical doctors who separately concluded that Mother was causing A.B.V.'s condition by depriving her of adequate nutrition. As set out above, their conclusions were based on multiple objective factors and the ruling out of other potential causes. In that regard, the evidence tended to show that A.B.V. displayed a general pattern of symptoms arising only when Mother had access to A.B.V.—symptoms that could be induced by giving A.B.V. diuretics or water-diluted food. Further, Mother declined doctors' advice to bottle-feed A.B.V. in the hospital, and she resisted efforts to quantify the amount of breast milk A.B.V. was receiving. While Mother maintained that A.B.V. was refusing the bottle, multiple witnesses testified that after Mother was removed from the hospital, A.B.V. readily accepted the bottle from nurses. A.B.V. flourished and experienced no serious medical issues after Mother's access was restricted.

The placement of a feeding tube improved A.B.V.'s condition during her first hospitalization, but there was testimony that Mother was dishonest in requesting A.B.V.'s primary care physician to remove the tube. Mother also admitted that she administered "liver detox" pills to A.B.V. without consulting a pediatrician. There was additional testimony that Mother sent a letter encouraging A.B.V.'s foster mother to administer a "baby detox bath." Finally, a psychiatrist diagnosed Mother with FDIA, a condition which is consistent with the medical doctors' belief that Mother was intentionally causing A.B.V. to become ill.

Viewing these circumstances and the supporting evidence in the light most

12

favorable to the jury's verdict, a reasonable factfinder could form a firm belief or conviction that Mother engaged in conduct which endangered the physical well-being of A.B.V. *See In re J.F.C.*, 96 S.W.3d at 266; *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (concluding that the jury could reasonably have found that parents endangered their infant child by denying adequate nutrition where the child was critically ill at six weeks of age from lack of nourishment); *see also In re S.W.*, No. 02-05-00417-CV, 2006 WL 2988736, at *5 (Tex. App.—Fort Worth Oct. 19, 2006, no pet.) (mem. op.) (per curiam) (concluding that the evidence was legally sufficient to support an endangerment finding where there was testimony that appellant "attempted on multiple occasions in the past to admit her children to area hospitals when the children were not in need of medical treatment" and displayed traits of narcissism in therapy). We therefore conclude the evidence is legally sufficient to support termination pursuant to section 161.001(1)(b)(E) of the family code.

We next consider the disputed evidence to resolve the question of factual sufficiency. At trial, Mother and her witnesses testified that she was a caring mother, and she had diligently sought a solution to A.B.V.'s unexplained medical issues. They suspected that A.B.V.'s exposure to the HPV vaccine was to blame, because A.B.V. experienced no issues prior to inoculation. Mother believed that A.B.V.'s problems were further caused by A.B.V.'s poor coordination in breastfeeding and resistance to bottle feeding. However, the Department presented testimony by medical professionals that A.B.V.'s symptoms were not consistent with an accidental HPV vaccination. There was also evidence that A.B.V. had no trouble bottle feeding after Mother's access was

13

restricted.

In weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts in the evidence to form a firm conviction that Mother endangered A.B.V. by depriving her of adequate nutrition. *See In re C.H.*, 89 S.W.3d at 18–19; *see also In Interest of G.H.*, No. 02-14-00261-CV, 2015 WL 3827703, at *37 (Tex. App.—Fort Worth June 18, 2015, no pet.) (mem. op.) (en banc) (finding the evidence factually sufficient to support termination even where mother was described as a "loving, wonderful person who loves . . . all of her children" where there was evidence that mother had psychological problems and had provided her children methamphetamine); *In re E.P.C.*, 381 S.W.3d 670, 684 (Tex. App.—Fort Worth 2012, no pet.) (concluding that there was factually sufficient evidence that father endangered his infant child by failing to provide her with sufficient nutrition where child was diagnosed with failure to thrive but steadily gained weight following removal). Accordingly, we conclude that the evidence is factually sufficient to support termination pursuant to section 161.001(1)(b)(E) of the family code. *See In re J.F.C.*, 96 S.W.3d at 266.

Having concluded that the evidence is legally and factually sufficient to support at least one statutory ground for termination, we overrule Mother's first issue.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

In Mother's second issue, she contends that she received ineffective assistance of counsel.

### A. Standard of Review and Applicable Law

A parent's right to counsel in parental termination suits "embodies the right to effective counsel." *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003); *see In Interest of*

*E.R.W.,* 528 S.W.3d 251, 261 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (concluding that the right to effective counsel extends to non-indigent parents who have retained counsel). In a parental termination case, we apply the test enunciated in *Strickland v. Washington* to assess whether a parent's right to effective assistance of counsel was violated. *In re J.O.A.,* 283 S.W.3d 336, 341–42 (Tex. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Under *Strickland*, the parent must satisfy a two-prong test: (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Id.* at 342; *In re M.S.*, 115 S.W.3d at 545.

We look to "the totality of the representation and the particular circumstances of each case" in evaluating effectiveness. *In re M.P.A.*, 364 S.W.3d 277, 290 (Tex. 2012). We must give deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. Counsel's performance falls below acceptable levels of performance when the "representation is so grossly deficient as to render proceedings fundamentally unfair." *In re M.S.,* 115 S.W.3d at 545. The parent's burden is to show that "counsel's performance fell below an objective standard of reasonableness." *In re J.O.A.,* 283 S.W.3d at 343.

## B. Analysis

Mother asserts that trial counsel was deficient in failing to develop an alternate theory of causation for A.B.V.'s medical problems. In particular, Mother cites chart notations entered by a Dr. Georges Jeha at TCH, who wrote that he could not rule out adrenal insufficiency as the cause of A.B.V.'s problems. Dr. Jeha noted that A.B.V. failed her adrenal stress test, with a peak level of 16.7 units, whereas 18 units or above were required to pass the test. Mother maintains that because her trial counsel did not call

Dr. Jeha and otherwise advance this adrenal insufficiency theory, his representation fell below the objective standard of reasonableness demanded of constitutionally effective counsel. *See id.*

Mother's argument fails for two reasons. First, Dr. Jeha's chart notations were not entirely—or even mostly—favorable to Mother. Dr. Jeha described his encounter with A.B.V. in detail, noting that she was an eleven-month-old female with recurrent low sodium, which "was determined at last admission" to be "due to decreased sodium intake, possibly medical neglect," and who was "now admitted again for" dangerously low sodium, with child protective services "again" involved. And while Dr. Jeha did not rule out adrenal imbalance as a potential cause for A.B.V.'s problems, he felt the "most likely" cause of A.B.V.'s condition was "not enough salt intake." To address her symptoms, he primarily recommended reassessing A.B.V.'s diet as well as her "social situation."

More importantly, Mother neglects to mention that her alternate causation theory was fully explored at trial through the testimony of other witnesses. In particular, Mother's trial counsel drew out testimony that was substantially similar to Dr. Jeha's chart notations when he cross-examined the Department's chief caseworker, Megan Morales, about possible alternate causes of A.B.V.'s medical condition. Morales recited her own notes concerning a conversation she had with Dr. Grace Kim. According to Morales's testimony, Dr. Kim relayed her belief that while most aspects of A.B.V.'s case "fit[] the picture of total body salt and fluid depletion which is most likely caused by the mom," she could not rule out with absolute certainty the possibility that A.B.V.'s problems stemmed from a "possible adrenal insufficiency." Ultimately, Dr. Kim recommended another

hormone test to rule out this possibility.   Morales related her understanding that A.B.V. underwent multiple adrenal tests, passing the first and barely failing the second, and upon passing a third test in September of 2017, adrenal insufficiency was ruled out.

The topic of adrenal functions and testing was further developed through the testimony of Dr. Paul.   Dr. Paul agreed that A.B.V. failed an adrenal stress test, which revealed that A.B.V.'s peak cortisol levels were fifteen and a half units, which was slightly below the normal baseline.   He also agreed that adrenal cortisol insufficiency is a known cause of low sodium levels.   However, he stated that cortisol insufficiency was "rarely" found to be the cause of low sodium "in a child like this."   Dr. Paul testified that A.B.V.'s average day-time cortisol levels were all within normal limits, and A.B.V. never showed a severe cortisol deficiency during any of her hospital stays.   Mother's counsel cross-examined Dr. Paul at length concerning the reliability of the hospital's cortisol testing and the possibility that a cortisol deficiency was to blame for A.B.V.'s problems, but ultimately Dr. Paul testified that he considered A.B.V.'s day-to-day cortisol production to be adequate, and he did not believe that a cortisol deficiency was causing A.B.V.'s symptoms.   Rather, his "fairly strong" belief was that Mother was the source of A.B.V.'s issues.

Similarly, Dr. Lukefahr agreed that A.B.V. showed a slight deficiency on her cortisol stress test and that adrenal insufficiency is a known potential cause of low sodium.   He believed, though, that A.B.V.'s cortisol levels were only slightly below normal and didn't appear to be "clinically significant."   In his view, A.B.V.'s low cortisol test "was really more of sort of just a lab variation," and Mother most likely caused A.B.V.'s problems.

Based on the comprehensive fashion in which this alternate causation theory was brought before the jury, and the limited potential that Dr. Jeha's views would have impacted Mother's defense, we cannot conclude that Mother's trial counsel was constitutionally deficient in failing to bring him before the jury. *See In re M.S.*, 115 S.W.3d at 545; *see also Rodriguez v. Tex. Dep't of Family & Protective Servs.*, No. 03-10-00361-CV, 2011 WL 3435736, at *3 (Tex. App.—Austin Aug. 4, 2011, pet. denied) (mem. op.) (finding mother's trial counsel reasonably effective in a termination case where counsel developed testimony that mother was loving and that there were other possible medical causes of her child's injury, however unlikely).

Lastly, Mother argues that her previously retained counsel was deficient in failing to forward her counseling records to the Department. Mother does not identify any way in which this omission prejudiced her case. Rather, Mother concedes that, in all likelihood, her most recent trial counsel did in fact forward her counseling records to the Department before trial. Therefore, we conclude that Mother has failed to demonstrate adequate prejudice under the second prong of *Strickland*. *See In re J.O.A.*, 283 S.W.3d at 342.

Having concluded that Mother failed to demonstrate both prongs of *Strickland*, we overrule Mother's second issue.

## IV.    CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Delivered and filed the
14th day of February, 2019.

18